UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

N.M., a minor, by and through :
his parents, M.M. and L.M.,    :    HONORABLE JOSEPH E. IRENAS
and on their own behalf,       :      sitting by designation
                               :
        Plaintiffs,            :
                               :    CIVIL ACTION NO. 08-cv-1162
    v.                         :
                               :        **OPINION**
SCHOOL DISTRICT OF             :
PHILADELPHIA,                  :
                               :
        Defendant.             :

**APPEARANCES:**

LESLIE MARRANT, ESQ.
625 Wynnewood Road
Philadelphia, Pennsylvania 19151
          Counsel for Plaintiffs

OFFICE OF GENERAL COUNSEL, PHILADELPHIA SCHOOL DISTRICT
By:  Miles H. Shore, Esq.
440 North Broad Street, 3rd Floor
Philadelphia, Pennsylvania 19130
          Counsel for Defendant

**IRENAS**, Senior District Judge:

     Plaintiffs, L.M. and M.M, individually and on behalf of

their minor son, N.M., bring this Individuals with Disabilities

Education Act ("IDEA") suit, 20 U.S.C. §§ 1400-1491, against

Defendant, Philadelphia School District (the "School District").

Plaintiffs assert that Defendant failed to provide N.M. with a

free and appropriate public education.  They seek tuition

reimbursement for their unilateral placement of N.M. in private

school for the 2007-2008 school year.[1]

Defendant moves for judgment on the administrative record. Plaintiffs move for summary judgment. For the reasons stated herein, Defendant's Motion will be granted and Plaintiffs' Motion will be denied.[2]

## I.

At the time the present dispute arose-- prior to the 2007-2008 school year-- N.M. was eight years old. He had never been a student in a "regular education"[3] classroom; indeed, he had never attended a public school. Rather, N.M., spent the past two school years (kindergarten and first grade) at Stratford Friends School, a private school for children with "various learning differences, mostly language-based learning differences." (Due Process Hearing Transcript, hereafter "Tr.", at p. 22, Testimony of Timothy Madigan[4]) Defendant paid N.M.'s tuition both years.[5]

---

[1] The Court has subject matter jurisdiction pursuant to 20 U.S.C. § 1415(I).

[2] Within the Motion for Summary Judgment, Plaintiffs also moved the Court for leave to submit an over length brief. That motion will be granted. The Court has considered all of Plaintiffs' submissions in reaching its decision.

[3] The Court uses this term because it was the term used by the parties during the due process hearing.

[4] Dr. Madigan, who testified on Plaintiffs' behalf, is the board chair of Stratford Friends School.

[5] Plaintiffs' brief in support of their instant motion indicates that both tuition payments were the result of settlement agreements resulting from due process proceedings initiated by Plaintiffs. (Pls' Opening Brief, p. 5-6)

The parties do not dispute N.M.'s eligibility for services.

The administrative record demonstrates, and the parties generally do not dispute, that N.M. faces serious challenges in receptive and expressive language skills.  He also has impairments in auditory processing and socialization, and has difficulty with inattentiveness and distractibility.[6]

Specifically, the most recent evaluation of N.M., conducted in March, 2007, by Dr. Auritt, on behalf of Defendant, observed the following:

> Results have consistently shown that [N.M.] presents with a mixed receptive-expressive developmental language disorder and that he does not show evidence of Mental Retardation.[7]  Although most evaluations have ruled out Autistic Disorder, there has been some indication that he may have Pervasive Developmental Disorder-Not Otherwise Specified.[8]  [N.M.'s] teachers were interviewed, and they report that he has made significant progress, although the interrelationship of attention, memory and language continued to be a concern. . . .  Previous evaluations have noted his need for 'social modeling' as part of his program, but he is currently in a class totally comprised of students with special needs, and observations failed to note any evidence of meaningful interactions

---

[6]  N.M. was subsequently diagnosed with ADHD, however, Defendant was not aware of that particular diagnosis at the time the IEP at issue was created.

[7]  A previous evaluation had concluded that N.M.'s IQ was "within the Average or age-appropriate range."  (Plaintiffs' Ex. 2)

[8]  As Dr. Auritt's report notes, Pervasive Developmental Disorder-Not Otherwise Specified (PDD-NOS) is a diagnosis "below the cut-off for autism," but is on the spectrum of autistic disorders. (Plaintiffs' Ex. 7)  N.M.'s score on the relevant test "'did not reach the cutoff provided by the test authors for Autism Spectrum Disorder and was thus much below the cutoff suggested for a diagnosis of Autism (the more severe end of the spectrum).  Rather his score was on the borderline for Autism Spectrum Disorder, suggesting that he does demonstrate a pattern of needs in terms of communication skills, reciprocal social interaction skills, and atypical behaviors and that the severity is subthreshold for full diagnosis.'" (Id.)

3

between [N.M.] and any other child. . . . Observations
indicate   that   expressive   language   issues   and
attentional problems continue to be present. Although
it is questionable whether [N.M.] meets the criteria
for PDD-NOS, it would not be appropriate to change
this diagnosis based on the limited scope of this
reevaluation. . . . [B]ecause [N.M.] presents with a
disorder in one or more of the basic psychological
processes involved in understanding or in using
language, spoken, or written, . . . he meets criterial
for a diagnosis of Specific Learning Disability.

(Plaintiffs' Ex. 7)

The report gave six recommendations:

1. [N.M.] is eligible for, and in need of, placement
in a Learning Support program because of a Specific
Learning Disability.

2. His program should provide him with intensive
multi-sensory, structured, language-based
instruction that offers him rigorous instruction
commensurate with his average ability to learn.

3. Skills should be introduced with many
repetitions for mastery.

4. [N.M.] should be provided with opportunities for
demonstrations, modeling, and guided practice.

5. [N.M.] should be provided with opportunities to
interact with nonhandicapped students to enable him
to have social modeling experiences. Removing him
from a regular school environment may be
counterproductive to developing age appropriate
skills. [N.M.] should spend at least part of the day
interacting with non-disabled peers in the regular
education setting.

6. His program should include social skills
training.

(Id.)

Additionally, an Auditory Processing evaluation of N.M.,

also conducted in March, 2007, revealed "an auditory processing

4

disorder, specifically a deficit in the area of decoding."

(Plaintiffs' Ex. 8)   The report made the following

recommendations:

> 1. . . . [N.M.] can be expected to have more than
> average difficulty with verbal conversation in the
> presence of background noise.  Therefore, extraneous
> noise should be minimized in order to give [N.M.]
> the best possible signal to hear and understand
> others.  When in the classroom [N.M.] should be
> given preferential classroom seating in order to
> best hear his teachers.
>
> 2. [N.M.] should consider the use of programs such
> as Fast Forward and Earobics to improve his phonemic
> understanding. . . .
>
> 3.   Individuals exhibiting a decoding deficit tend
> to require a slower and clearer signal in order to
> obtain the best possible understanding. [N.M.'s]
> family and teachers should use slower and clearer
> speech, especially in situations where there is
> extraneous noise, to enable him to understand
> better.
>
> 4. [N.M.] will also benefit from multi-modal
> learning strategies. . . . Presenting information to
> [N.M.] both visually, by writing information down,
> and auditorily will help facilitate his
> comprehension of the topic.
>
> 5.  As [N.M.] gets older the use of a note taker in
> the classroom will benefit him.
>
> 6.  Repetition and redundancy of information will
> aid [N.M.] in following conversations in situations
> where he has difficulty understanding others.

(Id.)

N.M.'s proposed IEP for the 2007-2008 school year, the IEP

at issue (Defendant's Ex. 7), principally relied on these two

evaluations in crafting a program to meet N.M.'s needs.

The IEP contemplates that N.M. would split his classroom time between a special education "Learning Support" classroom, and a "regular education" classroom.  In both classrooms, N.M. would receive one-to-one support from an assistant "to assist with transitioning, distractibility, and language processing." (Id.)  It also provides for "Modifications" and "Specially Designed Instruction (SDIs)," specific to discrete goals in literacy, math, and speech-language.  Other general accommodations are prescribed to apply across the board.  Insofar as relevant here, the IEP sets out the following specific SDIs:

Literacy

- preferential seating arrangement

- computer based reading intervention such as Earobics, Fast ForWord, and Read 180

- multisensory instructional program moving step by step from simple to more complex material in a sequential, logical manner through visual, auditory, kinesthetic, and tactile strategies and approaches

- use of kinesthetics (tapping out individual phonemes in a word) in decoding practice

- small group instruction for structured decoding program

Speech-Language

- set up structured peer interaction opportunities

- engineer classroom environment so [N.M.] has appropriate opportunities to

> interact with peers
>
> - visual, verbal and tactile cues for tongue placement
>
> - small group instruction
>
> Math
>
> - simplified directions
>
> - decoding of words upon request for mathematics and science
>
> - oral practice for addition/subtraction facts (through music)
>
> - preferential seating arrangement to address distractibility

(Id.) and the following general accommodations:

> - gain [N.M's] attention before imparting verbal information
>
> - provide multisensory input to facilitate attention/focus on classroom activities
>
> - multisensory strategies to be used across all environments
>
> - provide visual supports
>
> - rephrase instructions, verbal prompting and modeling, slower rate of speech, repeat directions

(Id.)

Lastly, the IEP provides that teachers and staff working with N.M. will receive one-time "training in providing multisensory strategies, visual strategies and social skills training," and that a "collaborative dialogue and discussion

7

[will occur] between the Orton Gillingham[9] trained teachers and other staffers who will work with [N.M.]."  (Id.)

On August 23, 2007, L.M. formally rejected the proposed IEP, and requested a due process hearing.  N.M. returned to Stratford Friends School for the 2007-2008 school year.

At the due process hearing, held on September 26, and October 10, 2007, Plaintiffs sought tuition reimbursement for the 2007-2008 school year, asserting that the proposed IEP failed to provide N.M. with a free and appropriate public education ("FAPE").  On October 31, 2007, the hearing officer issued a written decision, concluding that the IEP "offers [N.M.] the high level of services that he needs in order to make educational progress, and provides [N.M.] with academic support.  The IEP is designed to address [N.M.'s] areas of identified need." (Decision of Hearing Officer, p. 10)

The hearing officer also concluded that "the Stratford Friends School is deemed inappropriate given that it fails to respond to the IDEA's least restrictive environment requirement." (Id. at p. 12)  Accordingly, the hearing officer ordered that the School District was not obliged to pay for N.M.'s tuition at Stratford Friends School.[10]

Plaintiffs appealed to the Pennsylvania Special Education

---

[9]   Orton Gillingham is a particular method of MSSL instruction.  It is used at Stratford Friends School.  (Tr., p. 24)

[10]   Tuition for the 2007-2008 school year was $27,700.

Appeals Panel, which affirmed the hearing officer's decision. This suit followed.

## II.

"When deciding an IDEA case, the district court applies a modified *de novo* review and is required to give due weight to the factual findings of the ALJ." *M.S. v. Ramsey Bd. of Ed.*, 435 F.3d 384, 389 (3d Cir. 2006).[11] The Court must "defer to the ALJ's factual findings unless it can point to contrary non-testimonial extrinsic evidence on the record." *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003). The Court's decision is based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B)(iii).

"Because the IDEA requires a district court to grant a judgment on the record based on its own ascertainment of the preponderance of the evidence, many IDEA claims do not fit into the typical summary judgment standard of 'no genuine issues of

---

[11]   Plaintiffs assert that in this case, the Court should give less deference to the hearing officer's decision and apply a de novo standard of review.  Plaintiffs point to the undisputed fact that, due to an inadvertent error, several of Plaintiffs' exhibits were never formally admitted into evidence at the due process hearing, even though they were considered during the hearing.  Because of this apparent oversight, Plaintiffs filed with this Court a Motion to Supplement the administrative record.  Defendants, also recognizing the oversight, did not oppose the admission of those documents that should have been received in evidence.  Thus, those documents are now properly part of the record before this Court and this Court has considered them.  Given that there appears to be no dispute that this evidence was actually considered at the due process hearing the Court is skeptical that a less deferential standard of review is appropriate.  In any event, the Court need not decide the issue because even under a de novo standard, the result would be the same.

material fact.'" *L.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974
(10th Cir. 2004).  The parties in this case are effectively
seeking "a judgment on the administrative agency's record." *Id.*
Although seeking judicial review of an administrative agency's
decision by way of a summary judgment motion "is permissible
under the IDEA, it is not a true summary judgment procedure.
Instead, the district court essentially conduct[s] a bench trial
based on a stipulated record." *Ojai Unified Sch. Dist. v.
Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993).

## III.

### A.

Plaintiffs contend that Defendant failed to provide N.M. a
"free and appropriate public education" ("FAPE") thereby
entitling them to reimbursement for their unilateral placement of
N.M. in Stratford Friends School during the 2007-2008 school
year.

The IDEA provides:

(C) Payment for education of children enrolled in
private schools without the consent of or referral
by the public agency

    (I) In general
      . . . this subchapter does not require a
local educational agency to pay for the cost of
education, including special education and
related services, of a child with a disability
at a private school or facility if that agency
made a free and appropriate public education

available to the child and the parents elected
to place the child in such private school or
facility.

(ii) Reimbursement for private school placement
If the parents of a child with a
disability, who previously received
special education and related services
under the authority of a public agency,
enroll the child in a private elementary
or secondary school without the consent of
or referral by the public agency, a court
or hearing officer may require the agency
to reimburse the parents for the cost of
that enrollment if the court or hearing
officer finds that the agency had not made
a free and appropriate education available
to the child in a timely manner prior to
that enrollment.

20 U.S.C. § 1412(a)(10)(C)(I)-(ii); *see also* 34 C.F.R. §300.403

(same). Thus, when parents seek reimbursement for a unilateral

private placement, the Court must first determine whether the

School District provided the student FAPE by answering the

question, "is the individualized educational program developed

through the [IDEA's] procedures reasonably calculated to enable

the child to receive educational benefits?" *Bd. of Ed. v.*

*Rowley,* 458 U.S. 176, 206-07 (1982).

FAPE is an education that is "specially designed to meet the

unique needs of the handicapped child, supported by such services

as are necessary to permit the child to benefit from the

11

instruction." *Rowley*, 458 U.S. at 188-89.[12]  "The education
provided must be sufficient to confer some educational benefit
upon the handicapped child, although the state is not required to
maximize the potential of handicapped children." *Ramsey Bd. of
Ed.*, 435 F.3d at 390 (internal quotations omitted).  The benefit
conferred must be "meaningful," not merely "more than trivial."
*Id.*  Plaintiffs bear the burden of demonstrating that N.M's IEP
did not provide him a FAPE.  *Schaffer v. Weast*, 546 U.S. 49, 126
(2005); *Ramsey Bd. of Ed.*, 435 F.3d at 391.

Before rejecting the 2007-2008 IEP, L.M. observed a
representative regular education classroom and a learning support
classroom.  L.M.'s observations form the basis of her objections
to the IEP.  She testified at the due process hearing:

> [N.M.'s] ability to comprehend [information] as you're
> teaching it to him is challenged, it is delayed.  So in
> a regular education environment without what I consider
> appropriate accommodations to address  and I raised
> this at the IEP meeting, I said . . . what are we going
> to do?  You take this child out of this room and put
> him in learning support for reading and math . . . what
> do you do when you put this child with the same
> auditory- his auditory processing delay doesn't leave,
> doesn't go away outside of that learning support
> classroom.  It is a delay in processing.  So as he's
> back in the regular education classroom for science,
> history, art and music, how are you accommodating that

---

[12]  *See also* 20 U.S.C. § 1401(9) ("The term 'free and appropriate public
education' means special education and related services that- (A) have been
provided at public expense, under public supervision and direction, and
without charge; (B) meet the standards of the State educational agency; (C)
include an appropriate preschool, elementary, or secondary school education in
the State involved; and (D) are provided in conformity with the individualized
education program required under section 1414(d) of this title."); 34 C.F.R. §
300.13 (same).

delay without significant modification . . . and this is why I objected. He's got the delay. It doesn't go anywhere. And in a classroom with 28 kids . . . how are you accommodating for that delay? It's accommodated at Stratford Friends. It is taught differently. . . .

[I observed in the regular classroom] [a] group of children over in the corner doing some computers, they were loud. . . . [I]t was just eight year old activity. But . . . because they were in small groups . . . four to five kids per group, there was a lot going on. It was for [N.M.] loud and somewhat distracting. There was a lot of movement and the children were working independently. . . . I have great concerns about that. . . . the noise level, the distractibility and then [N.M's] ability to sit down with another group of students.

. . . [T]he IEP calls for intensive and rigorous multisensory instruction. . . . Everyone has agreed and the phrase has been used repeatedly that [N.M.] needs intensive rigorous multisensory instruction, not some reasonable adaptation thereof.

And so I did not witness any multisensory strategies being utilized in either setting, the regular ed setting or the learning support setting. . . .

There was a teacher reading with some students and then the other students she was not working with were working at the computer. . . . If that is what has been proposed as, that is what has been proposed to me, I asked to see it, I looked at it, I went and observed. I don't believe that that type of instruction . . . as is proposed for my son offers him intensive rigorous multisensory structured language instruction. Nor do I believe it can, that the program is set up that way nor the settings can accommodate that.

(Tr., p. 139-40; 146-47; 153-55) The Court addresses in turn each

of the issues raised by L.M.'s testimony and reiterated by

Plaintiffs' submissions to this Court.

Asserted inadequacy of MSSL instruction

It is apparent from the administrative record that

Plaintiffs' principal complaint lies with the School District's proposal to address N.M.'s undisputed need for "intensive multi-sensory, structured, language-based instruction" ("MSSL"). (Plaintiffs' Ex. 7)   Plaintiffs contend that the IEP's provision for "multisensory strategies" across all environments, does not meet N.M.'s undisputed need for *intensive* and *rigorous* MSSL instruction.   In essence, Plaintiffs assert that because the IEP does not propose that rigorous and intensive MSSL instruction be used "across the entire curriculum, across the entire school day," (as is done at Stratford Friends School) the School District's proposal is "wholly insufficient."   (Pls' Opening Brief, p. 23-24)

The relevant inquiry however, is whether the IEP's provisions are reasonably calculated to enable [N.M.] to receive educational benefits; and importantly, Plaintiffs bear the burden of proof.   Nothing in the record supports the conclusion that N.M. will not meaningfully benefit from the School District's proposal.

In support of their position, Plaintiffs rely on the testimony of Dr. Madigan,[13] who opined that the School District's IEP was inadequate because it did not "go[] far enough to support

---

[13]   The only other people to testify on Plaintiffs' behalf were L.M. and M.M.

14

all of the needs that [N.M.] has." (Tr., p. 42)[14]  With specific
reference to the IEP's proposed "multisensory instructional
program[15]" to be used "across all environments" for the "entire
school day," (Def's Ex. 7), Dr. Madigan expressed doubts as to
whether the School District could successfully implement the
proposal:

> Q: Can you indicate for the record given your
> expertise in multisensory language based programs
> whether or not this indicates a full language based
> program or partial or something else?
>
> A: This seems to indicate a reading program.
>
> Q: Okay, and can you just distinguish for the record
> with a reading type program and the full-time
> multisensory language based program that [evaluators
> recommend for N.M.]?
>
> A: Well, this because of what this calls for . . .
> that's just a piece of it.  And it's I guess the
> difficulty in answering your question is that it is
> not clear when everything is across all environments
> an entire school day. . . . it's not clear as to how
> this works.  If you have several goals supposedly
> playing out across all environments in the entire
> school day, if he's going to be moving in and out of
> classes, the multisensory instructional program . .
> . more than likely can't take place across an entire
> school day is he's moving in and out classrooms.
>
> Q: And why not?

---

[14]   Plaintiffs state that the Hearing Officer erred by failing to
qualify Dr. Madigan as an expert.  While the Hearing Officer declined to rule
on whether Dr. Madigan was an expert, he allowed him to testify, answering
each of Plaintiffs' counsel's questions over the objections of the School
District's counsel.  Even if there was a procedural violation, the Court fails
to see how the violation could have prejudiced Plaintiffs.

[15]   The entire description reads, "multisensory instructional program
moving step by step from simple to more complex material in a sequential,
logical manner through visual, auditory, kinesthetic, and tactile strategies
and approaches."  (Def's ex. 7, p. 13)

A: Well, because if he's going from a specialized
class, which I would presume had fewer students to a
general ed class that has more students, that's
intense not only for the student, but also for the
teacher, so I'm not sure the teacher with how many
other students can instruct in this manner to meet
[N.M.'s] needs.

(Tr., p.48-49)

Crucially, however, Dr. Madigan did not state that the
School District's proposal would not provide meaningful benefits
to N.M.

Plaintiffs also believe that the School District's teachers
are insufficiently trained in comparison with the teachers at
Stratford Friends School. Specifically, the undisputed record
shows that the School District's teachers have had some training
in the Orton Gillingham method of MSSL. Plaintiffs rely on the
undisputed fact that the teachers at Stratford Friends School
have had more training in the Orton Gillingham method, thereby
reasoning that the School District's training must be inadequate.
However, Plaintiffs have put forth no evidence that the School
District's training is inadequate-- i.e., is not reasonably
calculated to result in educational benefits-- irrespective of
the training of teachers at Stratford Friends School.

The hearing officer's and the appeals panel's determination
that the proposed IEP is adequate is sufficiently supported by
the record. N.M.'s evaluation recommends rigorous and intensive
multisensory, structured, language-based instruction. The IEP

16

proposes to meet that need through a "multisensory instructional program moving step by step from simple to more complex material in a sequential, logical manner, through visual, auditory, kinesthetic, and tactile strategies and approaches." This program is to be provided "across all environments" for "the entire school day." Moreover, the program is to be taught by teachers with training in the Orton Gillingham method of MSSL instruction. (See IEP at p. 28; Tr., p. 354-55; 392-93) Accordingly, the preponderance of the evidence supports the conclusion that N.M. would receive meaningful educational benefit from the School District's proposal for multisensory language instruction.

<u>Asserted failures to adequately address N.M.'s auditory processing needs</u>

Plaintiffs assert that the IEP does not adequately address N.M's auditory processing deficits because "the proposed IEP merely offers N.M. preferential seating in his classroom . . . use of computerized phonic intervention, [and] a temporary one-to-one aid." (Pls' Opening Brief, p. 28) However, Plaintiffs' argument ignores the other provisions of the IEP.

The IEP provides for "small group instruction for structured decoding program," "decoding of words upon request in math and science," and "rephras[ing] [of] instructions, verbal prompting and modeling, slower rate of speech, [and] repeat[ing] directions." All of these SDIs are to be provided across all

17

environments for the entire school day.  Additionally, the IEP calls for a one-to-one assistant to help N.M.'s language processing[16] with "the need for continuation of assistant *to be reevaluated following the first marking period.*"  (emphasis added)  Therefore, the use of the one-to-one assistant is not necessarily temporary.

Plaintiffs completely fail to address this evidence, much less carry their burden of demonstrating its inadequacy as a matter of law.  Moreover, the preponderance of all the evidence supports the hearing officer's and appeals panel's conclusion that the IEP was adequate.

Asserted failures to adequately address N.M.'s inattentiveness and distractibility

Plaintiffs' argument as to N.M.'s inattentiveness and distractibility[17] similarly fails.  Their argument completely ignores the IEP's provisions and instead relies solely upon the District's teacher's testimony that she would tap on N.M.'s paper if he needed to refocus on the task at hand.

---

[16]  Dr. Auritt testified that N.M. "would be having a one-to-one assistant who would be helping him to modify his program. . . . That one-to-one could be summarizing what was said [by the regular classroom teacher], adapting the material so that [N.M. is] getting the concepts that are being taught." (Tr., p. 256-57)

[17]  While Plaintiffs reference N.M.'s later diagnosis of ADHD, it is undisputed that that diagnosis was not known to the School District when the IEP was created.  Plaintiffs do not argue that the School District should have known of N.M.'s ADHD, rather they argue that the other information before the School District evidenced that N.M. had difficulties with attention and distractibility.

However, the IEP contains the following provisions: "preferential seating arrangement to address distractibility;" and "one-to-one assistant in regular and special education setting to assist with transitioning [and] distractibility." Even Plaintiffs' own witness testified on direct examination that use of a one-to-one assistant "would avoid distractibility." (Tr., p. 54)  Moreover, the IEP provides that N.M. would be in a special education classroom with fewer children for half the school day.  Plaintiffs' witness also testified that a small classroom would help with "distractibility issues."  (Tr., p. 62)

Plaintiffs fail to demonstrate how these accommodations are unlikely to produce meaningful educational benefits for N.M.  The hearing officer's and appeals panel's decision is supported by a preponderance of the evidence.

Other asserted deficiencies

Lastly, Plaintiffs assert that the IEP does not include any provisions for easing N.M.'s transition from the special education setting to a regular classroom, nor does it address N.M's need for social skills training.  Plaintiff's contentions are directly contradicted by the record.

With respect to social skills, the IEP directs that the School District will "[s]et up structured peer interaction opportunities" and "[e]ngineer [the] classroom environment so [N.M.] has opportunities to interact with peers."  In order to

facilitate progress in speech-language skills,[18] the IEP also calls for "role playing situations."  Moreover, Dr. Auritt testified that placing N.M. in the general education classroom was an important component of allowing N.M. to learn how to interact with non-disabled peers.  (Tr., p. 275-79)

Plaintiffs rely on Dr. Auritt's testimony that the IEP was "lacking" with regard to social skills training.  (Tr., p. 286) However, Dr. Auritt's testimony on cross-examination must be read in context:

> Q:  But your concern in your own evaluation is that [N.M's] social skills be addressed?
>
> A: That is correct.
>
> Q: So your expert opinion is that it is appropriately addressed by simply placing him in a regular education classroom?
>
> A: I think that would be part of the way. . . . I think there has to be direct emphasis on teaching him how to socialize with other children.
>
> Q: Okay, and if the August 2007 IEP fails to address it in the way you just articulated, would you still believe that it provides [N.M.] with a free and appropriate public education?
>
> A: I don't think it addresses that particular aspect of his needs.
>
> Q: Okay, again, my question is . . . do you still believe that that August 2007 proposed IEP provides [N.M.] with a free and appropriate public education on one of the needs that you evaluated he needs to

---

[18]   The specific goal is "will produce two contingent utterances about a context bound topic *when provided with conversational turn with a peer*, 80% of the time." (emphasis added)

have addressed, his social skills and it doesn't
give him any?

A:  I agree that that is lacking in the IEP.

Q: So my question is, yes or no, does it given [sic]
lack provide [N.M] with a free appropriate public
education?

. . .

A: . . . I believe the IEP is perfectly appropriate
except for that particular aspect.  I think it's
lacking.

(Tr., p. 285-86)

The transcript demonstrates that Dr. Auritt implicitly

accepted the erroneous assumption within the questions: that the

IEP had no "direct emphasis on teaching [N.M.] how to socialize

with other children."  (Id. at 285) Because the IEP does directly

emphasize social skills training, the hearing officer's and

appeals panel's decision on this issue is supported by a

preponderance of the evidence.

Moreover, nothing in the record supports the conclusion that

the Stratford Friends School would meet N.M.'s social skills

needs.  Dr. Auritt testified that "[N.M.] needs to learn how to

deal with the normal population.  And in the population he's in

right now [Stratford Friends School], he has almost no social

models for him."  (Tr., p. 277)[19]

---

[19]  Plaintiffs' witness, Dr. Madigan, testified that every student
enrolled in Stratford Friends School has a "learning disability or learning
difference of some type."  (Tr., p. 70)  Before the hearing officer,
Plaintiffs argued that N.M.'s after school program (not affiliated with
Stratford Friends School) provided N.M. with the opportunity to interact with

With regard to transitioning N.M. from his environment at the Stratford Friends School to the half-time general education classroom environment proposed by the School District, Plaintiffs are incorrect that the IEP does not include provisions to aid in the transition.  The IEP specifically states that the one-to-one assistant will help with transitioning.

Moreover, nothing in N.M.'s evaluations suggests that he will face any independent challenges in transitioning to the regular classroom.  While N.M. may face challenges associated with his receptive / expressive language skills, auditory processing deficits, distractibility, and social skills, as already explained, those issues are adequately addressed in the IEP.  Without a documented independent need for help with transitioning to a general education classroom, the conclusion that the IEP is adequate is supported by the preponderance of the evidence.

**B.**

Alternatively, the Court holds that the hearing officer was correct in concluding that even if the IEP was inadequate,

---

non-disabled students.  However, the hearing officer concluded that the after school program "does not provide for the structured educational opportunities afforded by the District's second grade classroom."  (Hearing Officer Decision, at 14) While Plaintiffs did not raise this argument before the appeals panel, and have not raised it before this Court, the Court notes that the hearing officer's decision is supported by Dr. Auritt's testimony. (See Tr., at 277-79)

Plaintiffs were not entitled to reimbursement because Stratford School is not the least restrictive environment for N.M.

A court may award a disabled student the cost of his private placement if the student's IEP is inappropriate and the student demonstrates that the private placement he seeks is proper. *See Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993). "A private placement is proper if it (1) is appropriate, i.e., it provides significant learning and confers meaningful benefit, and (2) is provided in the least restrictive educational environment." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007) (internal quotations and citations omitted).

Plaintiffs make no argument as to why Stratford Friends School is the least restrictive environment for N.M.; rather, they continually emphasize why the school's intensive MSSL instruction is appropriate for N.M. and why they believe the School District's proposal is inappropriate.[20] This Court has found no evidence in the record undermining the hearing officer's determination that Stratford Friends School was not the least

---

[20] Plaintiffs apparently misapprehend the law in this regard, asserting that they need not address the least restrictive environment requirement because the School District's proposed placement is allegedly inappropriate. However, as stated *supra*, the inquiry is whether Stratford Friends School -- the proposed private placement-- is proper (i.e., appropriate *and* the least restrictive environment). In order to prevail, Plaintiffs must establish all three points: the inadequacy of the School District's proposal, the appropriateness of the private school placement, and that the private placement is the least restrictive environment. *See Florence*, 510 U.S. at 15; *DeFlaminis*, 480 F.3d at 276.

restrictive environment for N.M.[21]  Additionally, as discussed *supra,* the record evidence supports the hearing officer's conclusion that Stratford Friends School does not appropriately address N.M.'s social skills needs.  Accordingly, tuition reimbursement must be denied for this alternate reason.

## IV.

The administrative decisions that (1) the School District's proposed IEP provides N.M with FAPE, and (2) Stratford Friends School is not a proper placement, are supported by a preponderance of the record evidence.  Accordingly, Plaintiffs are not entitled to tuition reimbursement.  Plaintiffs' Motion will be denied; and Defendant's Motion will be granted.  The Court will issue an appropriate order.

Date: November 9, 2008

 s/ Joseph E. Irenas
JOSEPH E. IRENAS, S.U.S.D.J.

---

[21]  The appeals panel did not reach the issue, which was an alternative holding by the hearing officer.

24

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

N.M. a minor, by and through,    :
his parents, M.M. and L.M.,       :
and on their own behalf,          :       HONORABLE JOSEPH E. IRENAS
                                  :          sitting by designation
          Plaintiffs,             :
                                  :       CIVIL ACTION NO. 2:08-cv-1162
     v.                           :
                                  :       **ORDER GRANTING PLAINTIFFS'**
THE SCHOOL DISTRICT OF            :       **MOTION TO FILE AN OVERLENGTH**
PHILADELPHIA,                     :       **BRIEF, DENYING PLAINTIFFS'**
                                  :       **AMENDED MOTION FOR SUMMARY**
          Defendant.              :       **JUDGMENT, AND GRANTING**
                                  :       **DEFENDANT'S MOTION FOR**
                                  :       **JUDGMENT ON THE ADMINISTRATIVE**
                                  :       **RECORD**
                                            (Docket Entries 18, 19/20)

**APPEARANCES:**

LESLIE MARANT, ESQ.
625 Wynnewood Rd.
Philadelphia, PA 19151
          Counsel for Plaintiffs

OFFICE OF GENERAL COUNSEL, SCHOOL DISTRICT OF PHILADELPHIA
By:  Miles H. Shore, Esq.
440 North Broad St., 3rd Floor
Philadelphia, PA 19130
          Counsel for Defendant

**IRENAS,** Senior District Judge:[1]

     This matter having appeared before the Court upon Plaintiffs'

Amended Motion for Summary Judgment[2] (Docket Entries 19/20) and

Defendant's Motion for Judgment on the Administrative Record (Docket

Entry 18); the Court having considered the parties' submissions;

having issued an Opinion on even date herewith, which findings of

fact and conclusions of law are incorporated herein by reference,

---

     [1]  Senior United States District Judge Joseph E. Irenas, sitting by
designation pursuant to the provisions of 28 U.S.C. § 292(b).

     [2]  The Motion for Summary Judgment also seeks leave to file a brief in
excess of the standard page limitations.

And for good cause appearing,

**IT IS** on this 9th day of November, 2008,

    **ORDERED THAT:**

      (1)   Plaintiffs' Motion to File and Overlength Brief is hereby **GRANTED** *nunc pro tunc*, effective the date of the motion's filing.

      (2)   Plaintiffs' Amended Motion for Summary Judgment (Docket Entries 19/20) is hereby **DENIED**.

      (3)   Defendant's Motion for Judgment on the Administrative Record (Docket Entry 18) is hereby **GRANTED**.

      (4)   The Clerk of Court is hereby directed to close ths file.

                            _s/ Joseph E. Irenas_____
                            JOSEPH E. IRENAS
                            Senior United States District Judge